UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                         :

DOUGLAS M. STERNBERG,            :

                                         :

                   Plaintiff,        :

         - against -             :        Case No. 14-cv-1003 (PAC)

                                         :

NEW YORK CITY HEALTH AND HOSPITALS  :
CORPORATION,                      :

                                         :

                 Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

BERANBAUM MENKEN LLP
Bruce E. Menken
Grace Cretcher
Attorneys for Plaintiff
80 Pine Street, 33rd Floor
New York, NY 10005
Ph: (212) 509-1616
Fax: (212) 509-8088

## TABLE OF CONTENTS

Table of Authorities ...................................................................................................... iii

I.     PRELIMINARY STATEMENT ............................................................................ 1

II.    MATERIAL FACTS ............................................................................................. 1

       A.   Plaintiff's Work and Medical History ...................................................... 1

       B.   July 2012 OHS Annual Examination and the Suspension of Plaintiff's Employment ..... 3

       C.   Plaintiff's Failed Attempts to Communicate with Defendant During His Suspension .... 6

       D.   Plaintiff's Post-Suspension Medical Treatment ...................................... 8

       E.   Termination of Plaintiff's Employment and Aftermath ......................... 9

III.   SUMMARY JUDGMENT STANDARD ........................................................... 12

IV.    ARGUMENT ....................................................................................................... 13

       A.   Defendant Violated Plaintiff's Rights Under the ADA When It Suspended and Terminated Him from His Job Because It Wrongly Regarded Him as Disabled. .......... 13

            a.   Plaintiff Demonstrates Direct Evidence of Discrimination. ................... 13

                 i.    Eldon Redwood ...................................................... 14

                 ii.   Lawrence Bailey ..................................................... 14

                 iii.  Yvette Villanueva ................................................... 14

                 iv.   Barbara Marrero .................................................... 15

                 v.    Documents ............................................................. 15

            b.   Plaintiff Can Also Demonstrate Discrimination Using the *McDonnell Douglas* Framework. ........................................... 15

                 i.    Plaintiff Has Made Out a *Prima Facie* Case of Disability Discrimination. ........................................ 16

                       1.   Plaintiff was Disabled. ................................. 16

                       2.   Plaintiff Was Qualified to Perform the Essential Functions of His Job. ................... 17

**3. Plaintiff Suffered Multiple Adverse Employment Actions Due to His Disability.** ....................................................................19

**ii. Any Purportedly Nondiscriminatory Reason for Plaintiff's Termination Advanced by Defendant is Pretextual.** ..........................20

**B. Defendant Violated Plaintiff's Rights under the NYSHRL and NYCHRL When It Suspended and Terminated Him from His Job Because It Failed to Engage in the Interactive Process and Provide Him a Reasonable Accommodation.** ....................22

**V.   CONCLUSION** ........................................................................................25

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...........................................................12, 13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................................12

*Hazeldine v. Beverage Media, Ltd.*, 954 F.Supp. 697 (S.D.N.Y. 1997) ......................................22

*Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) ....................................20

*Costello v. St. Francis Hosp.*, 258 F.Supp.2d 144 (E.D.N.Y. 2003) .....................................13, 16

*Giordano v. City of New York*, 274 F.3d 740 (2d Cir. 2001) ........................................................16

*Jochelman v. New York State Banking Dep't*, 83 A.D.3d 540, 920 N.Y.S.2d 661 (1st Dep't 2011) ........................................................................................................................................23

*Kerzer v. Kingly Mfg.*, 156 F.3d 396 (2d Cir. 1998) .............................................................12, 13

Kinneary v. City of New York, 601 F.3d 151 (2d Cir. 2010) ......................................................16

*Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531 (2d Cir. 1997) ........................12

*Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997) ..........................................13

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 218–19 (2d Cir. 2001) ....................23

*Martin v. United Parcel Serv. of Am., Inc.*, 104 A.D.3d 1173, 961 N.Y.S.2d 663 (4th Dep't 2013) ........................................................................................................................................23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...................................12

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ........................................15, 16, 19, 21

*Mitchell v. Washingtonville Cent. School Dist.*, 190 F.3d 1 (2d Cir. 1999) ...............................18

*Moran v. Wegmans Food Markets, Inc.*, 65 F.Supp.3d 327 (W.D.N.Y. 2014) ...........................19

*Morse v. JetBlue Airways Corp.*, 941 F.Supp.2d 274 (E.D.N.Y. 2013) ...............................23, 25

*Niagara Mohawk Power Corp. v. Jones Chemical, Inc.*, 315 F.3d 171 (2d Cir. 2003) ..............12

*Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171 (2d Cir.1992)), aff'd, 175 F.3d 1008 (2d Cir.) (unpublished table decision), cert. denied, 528 U.S. 817 (1999) ...................................................13

*Randle v. LaSalle Telecomms., Inc*., 876 F.2d 563 (7th Cir.1989) ...............................13

*Sobhi v. Sociedad Textil Lonia Corp*., No. 13 CIV. 8073 AT MHD, 2014 WL 7474338
(S.D.N.Y. Dec. 30, 2014) .......................................................................................13

*St. Mary's Honor Center v. Hicks*, 113 S.Ct. 2742 (1993) ......................................20

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981) ................20

*Thomson v. Odyssey House*, No. 14-CV-3857 MKB, 205 WL 5561209 (E.D.N.Y. Sept. 21,
2015) ...................................................................................................................16

*Vangas v. Montefiore Med. Ctr*., 6 F.Supp.3d 400 (S.D.N.Y. 2014) ...........................23

*Warmsley v. New York City Transit Auth*., 308 F.Supp.2d 114 (E.D.N.Y. 2004) .................13, 16

## Statutes, Rules, and Regulations

29 CFR § 1630 ........................................................................................................17

American with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*. ....................................1, 6, 13, 16, 17

Federal Rule of Civil Procedure 56(c) .......................................................................12

Federal Rule of Civil Procedure 56(e) .......................................................................12

New York City Human Rights Law, N.Y.C. Admin Code § 8-101 *et seq*. ............1, 16, 22, 23, 25

New York State Human Rights Law, Executive Law §§ 290 *et seq*. ....................1, 16, 22, 23, 25

# I.    PRELIMINARY STATEMENT

Upon the suspension of Plaintiff Douglas Sternberg ("Plaintiff") from his employment as a dentist for Defendant New York City Health and Hospitals Corporation ("Defendant" or "HHC") because of his hepatitis C ("HCV") screening test results, Plaintiff's direct supervisor was "surprised" to hear that Plaintiff's occupational HCV "was at a point where he had to be relieved of duty," because "HR knew about this for years." Ex. D[1] (Deposition Transcript of Lawrence Bailey ("Bailey Dep.")) at 85:22-25. Upon Plaintiff's inexplicable termination six months later, while he was still incapacitated by the grueling HCV treatment that Defendant had ordered he undergo, the Senior Associate Executive Director of Human Resources who decided to fire him did so based on the "clinical decision" of HHC's Occupational Health Services ("OHS") to regard Plaintiff as "unfit for duty," and the fact that "[t]here was no indication from OHS that [HHC] should provide him with more time because he's either getting better or there's another course or avenue we need to take." Ex. L (Deposition Transcript of Yvette Villanueva ("Villanueva Dep")) at 58:4-7, 62:16-18. Unfortunately for Plaintiff, that "other course" was the summary termination of his 29-year employment with HHC.

Accordingly, Plaintiff hereby provides this Memorandum of Law in support of his Motion for Partial Summary Judgment on Liability. Plaintiff moves for summary judgment on liability as to all his claims, which are brought under the American with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAAA"), the New York State Human Rights Law, Executive Law §§ 290 *et seq.* (the "New York State Human Rights Law" or "NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin Code § 8-101 *et seq.* (the "New York City Human Rights Law" or "NYCHRL").  Based on the following arguments, Plaintiff respectfully asks that his motion be granted, as no genuine issue of material fact exists as to Defendant's liability on these claims.

# II.    MATERIAL FACTS

## A.  Plaintiff's Work and Medical History

---

[1] All Exhibits referred to herein are to the Declaration of Bruce E. Menken in support of Plaintiff's motion.

Plaintiff began working as a dentist for the City of New York, employed by the City's Health and Hospitals Corporation ("HHC"), in January of 1985. Ex. A (Deposition Transcript of Douglas Sternberg ("Sternberg Dep.")) at 29:11. He worked for the first 17 years of his long and dedicated career with the city at Correctional Health Services, providing dental care to incarcerated individuals; 14 years treating inmates in the various jails located on Riker's Island, and the last 3 years treating inmates at the Queens House of Detention, both located in Queens, New York. *Id.* at 42:10.

During his time at Correctional Health Services, as during his whole career, Sternberg was dedicated to his work, accepting the risks attendant with providing care to a population with an increased rate of infectious disease. In fact, unbeknownst to him at the time, Plaintiff contracted hepatitis C ("HCV") from an inadvertent needle stick in 1992, while treating a patient in custody in a jail on Riker's Island. *Id.* at 61:16-18. He did not learn he had contracted the disease until 4 years later, when he tried to donate blood during a New York Blood Bank blood drive and his contribution was rejected after testing positive for HCV. *Id.* at 61:4. When he learned he was infected with HCV, Plaintiff immediately notified Correctional Health Services, and also filed a workers' compensation claim. *Id.* at 55:19, 56:4-8, 138:17-25. Plaintiff's workers' compensation claim was denied because Defendant successfully argued that HCV had not and did not prevent him from doing his job as a dentist in any way. *Id.* at 138:17-25; Ex. B (Workers Compensation Board Notice of Decision). In fact, every year between 1994 and 2001, Plaintiff was required to have an annual medical examination by HHC's Occupational Health Services ("OHS") and was medically cleared to work as a dentist. Ex. A at 49:1.

Around 2001, Plaintiff was reassigned to work for HHC in the Renaissance Health Care Network. *Id.* at 43:8. He worked at Sydenham Clinic as an Attending Level II Dentist and his job was to provide patient care and included the occasional performance of simple surgical extractions. Ex. C (HHC Job Description); Ex. D at 21:2-10, 43:20-25, 45:10-15, 47:3-9. Upon beginning work at Renaissance, Plaintiff was medically cleared for duty by OHS, which was aware of his HCV. Ex. A. at 46:19. No restrictions were placed on the dental work he could provide and no special instructions were given to him

2

on how to treat patients. *Id.* at 56:16-24. Lawrence Bailey, DDS, supervised Plaintiff's work for over a decade at Renaissance, and he believed Plaintiff performed his job satisfactorily during that time, obtaining patient outcomes as good as those of other dentists supervised by Bailey. Ex. D at 42:11-43:17.

Dr. Monte Nussbaum was Plaintiff's primary care physician between 2001 and 2009. Ex. A at 57:23. During these years, Dr. Nussbaum performed annual physical examinations on Plaintiff, including routine blood tests, and did not recommend any course of treatment for Plaintiff's HCV. *Id.* at 59:5-60:8. Plaintiff's blood tests showed that his liver function was impaired to some extent, which Dr. Nussbaum confirmed was entirely normal for a patient with HCV. *Id.* As there was no indicated treatment, pharmacological or otherwise, Plaintiff was not treated for his HCV during this time period. *Id.* at 57:7-15. Plaintiff was transferred from Sydenham Clinic to Grant Clinic in 2009, and there continued to be no restrictions placed on the procedures that he could perform. *Id.* at 74:1-5. From 2009 until July of 2012, Plaintiff continued to see Dr. Nussbaum annually. His blood was drawn every year, and despite elevated liver function tests, he was not treated for his dormant, asymptomatic HCV. *Id.* at 86:5-88:12.

Plaintiff was happy working at Renaissance, and his life and work were not limited or compromised in any way during this time. *Id.* As in prior years, Plaintiff had annual physical examinations conducted by OHS from 2009 through 2011, which are required for HHC-affiliated employees who engage in patient care. *Id.* at 93:1-7; Ex. E (HHC OHS Operating Procedure 20-19, dated March 20, 2003). As in prior years, OHS healthcare staff discussed Plaintiff's HCV status with him and cleared him to practice dentistry without restrictions in 2009, 2010, and 2011. Ex. A at 93:1-94:13. In fact, OHS's electronic chart notes documenting Plaintiff's annual physical examinations in 2010 and 2011 explicitly confirm that Plaintiff disclosed he had HCV to OHS, and he was nevertheless certified to perform his job with no issues. Ex. F (OHS electronic chart notes for Plaintiff).

**B. July 2012 OHS Annual Examination and the Suspension of Plaintiff's Employment**

Then, on July 9, 2012, Plaintiff presented at OHS for his 2012 annual physical examination so he could maintain his medical clearance to perform his job as a dentist at the Grant Clinic. Ex. A at 97:21-25.

Plaintiff discussed his medical history with a physician's assistant, including mentioning his documented history of HCV. *Id.* In response to Plaintiff's mention of his HCV, the physician's assistant called in Dr. Robert Carey, an OHS physician, who examined Plaintiff and discussed the Society for Healthcare Epidemiology of America ("SHEA") Guideline for Management of Healthcare Workers Who Are Infected with HBV, HCV, and HIV with Plaintiff. *Id.* at 98:12-23; Ex. G (SHEA Guideline, published January 20, 2010). Carey told Plaintiff that the SHEA Guideline was a new policy being advanced by Dr. Eldon Redwood, the director of OHS. Ex. A at 98:12-23. Dr. Carey showed Plaintiff several pages of the SHEA Guideline, and had him sign a pre-printed form letter template that indicated that under the SHEA Guideline, he was permitted to continue to work as long as he double-gloved, changed his gloves, reported any injuries, and continued to see his physician. Ex. H (sample SHEA contract letter, signed by Sternberg on July 9, 2012). This form references the meeting of an "Expert Advisory Panel on Infected Healthcare Workers," but there is no evidence whatsoever that HHC ever convened such a panel, that there was any meeting on or before July 9, 2012, or that such a panel even exists. *Id.* Dr. Carey then signed a referral permitting Plaintiff to continue working and ordered blood work done on Plaintiff. Ex. I (July 9, 2012 Employee Health Service Referral); Ex. A at 99:18. On July 11, 2012, Plaintiff returned to OHS and spoke to Dr. Carey about the SHEA Guideline. Ex. A at 100:23-25. Based on Plaintiff's reading of the Guideline, he believed there was a possibility it would prevent him from being cleared to perform surgical extractions, which constituted only 5 to 10% of his workload. *Id.* at 100:23-25, 101:1-6. Dr. Carey responded, "it probably won't even come to that." *Id.* Reassured, Plaintiff left Dr. Carey's office believing he would be cleared for duty despite his HCV, just as he had in all prior years. *Id.* at 107:10-11.

On July 13, 2012, Plaintiff returned to see Dr. Carey once again to get his blood test results. Dr. Carey told him that his viral load was beyond the barrier level recommended by the SHEA Guideline, and therefore that Plaintiff would be restricted from patient contact until the situation could be reviewed. *Id.* at 107:18-108:2. He also told Plaintiff to see a specialist and follow that specialist's recommendations regarding the treatment of his HCV. *Id.* at 109:2-10. Plaintiff was confused and taken aback, as nothing in

4

the SHEA Guideline whatsoever suggested he should be totally prohibited from treating patients, and just two days prior Dr. Carey had told him that he was unlikely to even be restricted from surgical extractions. *Id.* at 109:13-20; Ex. G at D445-46 n.j. Dr. Carey referred only to the SHEA Guideline, and not to any internal HHC policy or procedure, and on Plaintiff's departure, he did not advise Plaintiff to follow up with OHS at a later date or provide him with a return to work form or any similar document. Ex. A at 128:16-18. The only instructions that Plaintiff was ever given by Defendant regarding how to proceed in order to return to work following his suspension, from July 13, 2012 until he was terminated, were Dr. Carey's instructions to see a specialist and follow their recommendations.

On Monday, July 16, 2012, Plaintiff returned to work on administrative duty. Then, on July 18, 2012, Plaintiff's supervisor Bailey came to Grant and gave Plaintiff a letter signed by HHC employee Henry McFarlane, which indicated that Plaintiff was suspended without pay because he failed to pass his annual physical pursuant to HHC Operating Procedure 20-19. *Id.* at 11:9-23, 117:7-11; Ex. K (July 18, 2012 Suspension Letter). Sternberg had no knowledge of this HHC operating procedure, and he was not provided a copy of it along with the suspension letter. Ex. A at 119:1-8. In fact, at the time of his suspension on July 18, 2012, Operating Procedure 20-19 made no reference to HCV whatsoever and provided absolutely no explanation or justification for OHS's failure to medically clear him for duty or for HHC's suspension of his employment. Ex. E.

Operating Procedure 20-19 was updated to incorporate the SHEA Guideline on August 28, 2012 – 40 days after Plaintiff's suspension.  20-19 now discusses HCV, but just like the SHEA Guideline it incorporates, it indicates *only* that HCV-positive providers with viral loads above the Guideline's barrier level should be restricted from performing "Category III" procedures, which are procedures "for which there is definite risk for bloodborne virus transmission or that have been classified previously as 'exposure prone.'" Ex. J (Updated HHC OHS Operating Procedure 20-19, dated August 28, 2012).

As noted, the only work Plaintiff did for HHC that fell into this category was surgical extractions, which made up 5-10% of his work.  Ex. A at 101-1-6; Ex. G at D 445-46 n.j. Thus, even if the updated

20-19 had been in effect at the time of Plaintiff's suspension, it too fails to provide any justification or explanation for HHC's decision to prohibit Plaintiff from all patient contact. In short, as Defendant's witnesses explicitly confirm, Plaintiff was not cleared for duty after his 2012 OHS annual physical exam because in Defendant's view, Plaintiff's viral load was too high on July 9, 2012. Based on his HCV screening tests, Defendant regarded his HCV as effectively preventing him from providing healthcare for HHC and, as a result, Plaintiff was suspended without pay. Ex. K; Ex. L at 18:15-23, 57:22-58:7.

### C. Plaintiff's Failed Attempts to Communicate with Defendant During His Suspension

Immediately upon receiving the July 18, 2012 suspension letter, Plaintiff packed up his things, left the premises, and called Henry McFarlane from the subway station. Ex. A at 120:1-6. Plaintiff told McFarlane there had been some kind of mistake, because the suspension of his employment was completely contrary to what Dr. Carey had told him a few days earlier. *Id.* at 120:11-23. In fact, it was also contrary to the SHEA Guideline, the 2003 version of Operating Procedure 20-19, the not-yet-in-effect 2012 version of Operating Procedure 20-19, and, in fact, all general scholarship and recommendations on the subject of HCV-infected healthcare providers. Ex. E; Ex. G; Ex. J; Ex. R (Expert Report of Dr. David Bernstein). Plaintiff asked McFarlane if, instead of being suspended without pay, Plaintiff could take his accumulated sick leave, but McFarlane told him this was not permitted. Ex. A at 120:11-23. Sternberg followed up his call with McFarlane by sending him an email on July 19, 2012, memorializing the phone conversation they had had the day before. Ex. M (Sternberg/McFarlane email chain). In this email, Plaintiff objected to Defendant's refusal to grant him sick leave, informed McFarlane that HHC had known about his HCV as long as he himself had and had allowed him to treat patients the entire time, advised McFarlane that the Center for Disease Control ("CDC") does not recommend restricting the duties of a healthcare worker with HCV, and noted that he may be legally protected under the ADA. *Id.*

On July 20, 2012, McFarlane emailed Plaintiff to let him know that he had forwarded his email to Jorge Vidro, an HHC Network Human Resources EEO Officer, for "follow-up and resolution." Ex. N

(Sternberg/Vidro Email Chain). On July 21, 2012, Plaintiff emailed Vidro to reiterate his request for sick leave. *Id.* On July 23, 2012, Vidro responded to Plaintiff via email to advise him that Dwayne Davis of HHC's Network Labor Relations group, who was copied on Vidro's email, would look into "the details of your suspension and get back to you soon regarding your duty status." *Id.* Although Plaintiff had wanted to consume his sick leave pay, Vidro also echoed McFarlane's statement that this would not be possible under the circumstances, but told Plaintiff that he would be suspended with rather than without pay. Ex. A at 143:11-144:2. Plaintiff then emailed Vidro again to thank him for his prompt response and let him know that Plaintiff was looking forward to a rapid return to his clinical duties and "continued communication and cooperation" with Vidro and HHC generally. Ex. N. Plaintiff understood Vidro's email to mean that there was going to be an investigation, that he would be contacted by HHC Labor Relations regarding next steps, and that there would be a dialogue amongst the parties and a resolution would be reached. Ex. A at 145:7-11. In the meantime, Plaintiff turned his attention to following Dr. Carey's instructions by seeking HCV treatment from gastroenterologist Dr. Harold Lipsky. *Id.* at 127:12-15, 130:19-131:25.

On September 3, 2012, having not heard from Davis or Vidro since speaking to Vidro six weeks earlier, Plaintiff emailed Vidro to let him know he had not been contacted by Labor Relations (i.e. Davis) or Human Resources. Ex. N. Plaintiff also expressed concern about whether his deductions were being properly applied and his time sheets correctly coded. *Id.* Receiving no response, Plaintiff sought and obtained the assistance of his Doctors Council union representative Laurie Davidson. Ex. A at 49:13-19. Davidson made many attempts to contact Vidro to ascertain how to get Plaintiff back to work, including, *inter alia*, calling and leaving a telephone message for Vidro on September 21, 2012 and emailing and leaving another telephone message for Vidro on October 4, 2012. Ex. O (Davidson/Sternberg Email Chain). Despite the multiple emails and telephone messages left for Davis and Vidro between July 23 and December 15, 2012, neither of them, nor any other HHC Human Resources, Labor Relations, or OHS employee – or anyone else affiliated with Defendant whatsoever – ever contacted Plaintiff or his union

representative to advise him regarding "the details of [his] suspension" or his "duty status," or to give him even the slightest shred of information about what he needed to do in order to return to work. Ex. A at 145:17, 174:14-23, 183:3-12; Ex. P (Davidson Contemporaneous Notes at DC 32). In fact, Defendant's Associate Director of Finance, James J. Brady, expressed his extreme concern about Vidro's lack of communication in an email sent to Vidro and his boss, Yvette Villanueva, on December 6, 2012, referring to Vidro's 4-month delay. Ex. Q (James J. Brady Dec. 6, 2012 Email).

### D. Plaintiff's Post-Suspension Medical Treatment

Throughout the period between July 18, 2012 when he was suspended, and December 15, 2012, when he was fired, Plaintiff sought and obtained medical treatment from Dr. Lipsky to lower his HCV viral load. Ex. A. at 130:19-131:25. Plaintiff told Dr. Lipsky that Defendant had ordered him to seek such treatment because of its reliance on the SHEA Guideline, which Dr. Lipsky had never heard of. *Id.* at. 131:1-14. Nonetheless, Dr. Lipsky suggested a recently-developed new HCV treatment. *Id.* at 132:3-4. Plaintiff was treated with a regimen of three medications to bring down his viral load, and by October 23, 2012, his HCV viral load was undetectable. *Id.* at 132:24; Ex. V (Dr. Harold Lipsky Consultation Notes). Unfortunately, this medical treatment was also an incredibly grueling and unpleasant process, involving debilitating side effects such as weakness, malaise, flu-like symptoms, vomiting, fogginess, constipation, and horrific rectal burning, and requiring significant post-treatment recovery time. *Id.* at 152:15-153:13. Consequently, this treatment was not completed until January of 2013. *Id* at 189:21-22.

There is no scientific evidence or accepted scholarly research demonstrating a correlation between viral load and an increase in the risk of transmitting HCV. Ex. R. Viral load is not considered a risk factor for HCV transmission, and to the extent that the SHEA Guideline or Operating Procedure 20-19 uses inferences and non-scientific evidence to identify viral load as a risk factor for disease transmission, they are wrong. *Id.* In reality, the CDC do not and have never recommended that a healthcare worker performing non-invasive *or* invasive procedures be precluded from their work because they have HCV. Ex. S (CDC FAQs); Ex. T (Deposition of Transcript Eldon Redwood ("Redwood Dep.")) at 73:10-20; Ex.

U (Deposition Transcript of Dilica Ortega ("Ortega Dep.")) at 12:6-10.

### E.  Termination of Plaintiff's Employment and Aftermath

On or about December 15, 2012, after months of attempting to get information from Defendant about the procedures he should be following to return to work, having all attempts be wholesale ignored by Defendant, and enduring grueling and painful HCV treatment, Plaintiff received a letter summarily terminating his three-decade-long employment with HHC. Ex. W (December 6, 2012 Termination Letter). This letter was dated December 6, 2012 and signed by Barbara Marrero, and it purported to terminate Plaintiff because he allegedly failed to maintain his annual medical clearance as required by Operating Procedure 20-19. Ex. J, Ex. W. Although Marrero signed this termination letter, she did not draft it and does not know who wrote it, who decided what language to include in it, or whether the statements contained in it are true and accurate. Ex. X (Deposition Transcript of Barbara Marrero ("Marrero Dep.")) at 23:23-24:15. All Marrero knows is that the decision to terminate Sternberg's employment was "made through Mr. Vidro." *Id.* at 25:10-13. During her deposition, Marrero explained that Vidro, who has since died, told her that "there was a particular employee who failed to go to OHS, that he had HCV and he failed to go to OHS. Therefore, it's a condition of employment which falls under my jurisdiction and he needed to be separated from employment." *Id.* at 19:5-17, 25:2-9.

Villanueva, Vidro's boss, claims that she made the decision to terminate Plaintiff's employment because OHS gave him "some sort of test" and because the results did not meet the requirement that HHC follows, he was "unfit for duty." Ex. L. at 18:15-23, 57:22-58:7. She openly admits that Plaintiff's medical condition impacted her decision to terminate his employment. *Id.* at 62:1-21. She also claims that Plaintiff was terminated in the middle of his incapacitating HHC-ordered HCV treatment because the facility Plaintiff worked at needed someone to replace Plaintiff, as patient care was suffering. *Id.* at. 61:7-18. In fact, Plaintiff's supervisor had no trouble covering Plaintiff's patients, Defendant *never* hired a dentist to replace Plaintiff after his employment was terminated, and the Grant dental clinic was closed within a year because there were not enough patients seeking care. Ex. D at 60:14-22, 61:20-62:6; Ex. C

9

at 61:20-62:10.

On January 3, 2013, Dilcia Ortega, then the Associate Director of Infection Control at Harlem Hospital and Generations Plus, an HHC facility, met with Plaintiff's supervisor, Bailey, and the Director of OHS, Dr. Redwood. Ex. U at 14:9-23. According to Ortega, the purpose of the meeting was to review the SHEA Guideline recommendations. *Id.* at 15:2-5; 28:13-17. Ortega documented what was said and what occurred at the meeting for her supervisor, Dr. Consuelo Dungca. *Id.* at 21:18-25; Ex. Y (January 4, 2013 Dilcia Ortega Email). Ortega wrote that Dr. Redwood had "already consulted with the infectious disease team" and "reached out to the OHS group" to inquire about their recommendations, but Ortega had no independent knowledge that these statements allegedly made by Redwood were true. *Id.* at 24:12-24, 26:4-27:2. Ortega further wrote that there was no need to be concerned about the exposure of Plaintiff's patients to his HCV virus, but she cannot say who told her this. *Id.* at 29:10-18. Finally, Ortega wrote that Plaintiff was basically asymptomatic and routinely "double gloved," which she was told by Bailey, Plaintiff's supervisor. Ex. Y; Ex. U at 30:22-31:4. Bailey denies telling Ortega that Sternberg double gloved and washed his hands. Ex. D at 123:14.

Although Plaintiff had gone to see Dr. Lipsky immediately upon being suspended, Ortega nevertheless concluded her notes by stating, wholly inaccurately, that he was "not following up with his personal physician" and that he "refused to follow up with his physician for proper management and he was removed from his duties," but Ortega does not remember who told her this and has no idea whether or not Plaintiff followed up with his personal physician for "proper" management of his HCV. Ex. Y; Ex. U at 34:2-35:12. Ortega's January 4, 2013 email is based exclusively on speaking to Bailey and Redwood for 5-10 minutes on January 3, 2013 and not generated from any other contact or source. Ex. U at 34:6-13. In contrast, Bailey, Plaintiff's supervisor, testified that there was no discussion with Ortega, with or without Redwood, concerning Plaintiff's contacts with his personal physician. Ex. D at 122:23-123:4.

After being terminated, Plaintiff again contacted his union representative Laurie Davidson. Ex. A at 175:6-8. Davidson was very upset because, prior to Plaintiff's termination, she had placed numerous

calls and left numerous messages for Vidro trying to find out what was needed to get Plaintiff back to work and she received absolutely no direction, information, or cooperation from HHC. Ex. Z (Deposition Transcript of Laurie Davidson ("Davidson Dep.")) at 81:9-20.; Ex. P. On or about January 3, 2013, Davidson finally spoke to Marrero, who indicated that she would discuss Plaintiff's employment status with Davidson once his viral load was reduced and he had clearance from his doctor. Ex. P; Ex. A at 176:23-177:2; Ex. Z at 90:1-6. This was the very first time Defendant had given any indication whatsoever, since July of 2012 when Dr. Carey told Plaintiff to seek out a specialist and follow their recommendations, that Defendant had provided even a shred of information about what Plaintiff needed to do to return to work. Ex. A at 177:6-12. After Davidson notified him of what Marrero had said, Plaintiff immediately contacted Dr. Lipsky and asked him to provide a letter regarding Plaintiff's reduced viral load, which had been attained by Plaintiff through significant personal suffering. *Id.*

On January 17, 2013, a cover letter from Plaintiff, a release authorizing Marrero to speak to Plaintiff's wife, and a January 14, 2013 letter from Dr. Lipsky confirming that Plaintiff could return to work as a dentist without restrictions were faxed to Marrero. Ex. AA (Faxed Dr. Lipsky Letter to Marrero). Unable to reach Marrero by telephone yet again, on January 18, 2013, Davidson emailed Marrero the same letter from Dr. Lipsky that had been faxed to her a day earlier. Ex. BB (January 18, 2013 Davidson email to Marrero). As Plaintiff had come to expect by this point, Marrero ignored the January 17, 2013 fax and January 18, 2013 email and Dr. Lipsky's letter confirming that Plaintiff was fit for duty as a dentist. Ex. Z at 91:4-18. Marrero's reason for refusing to return Plaintiff's wife's calls about the situation was that Plaintiff's wife was "nasty to the staff." Ex. CC (January 29, 2013 Marrero email to Vidro).

Despite Plaintiff's months-long campaign to get anyone at HHC to even *speak* to him about how he could return to work, according to Villanueva, Defendant's decision to terminate Plaintiff's employment and refusal to allow him to return was based on the fact that Plaintiff supposedly had ample time to correct what Defendant perceived as a problem and did not do so. Ex. DD (January 30, 2013

Vidro email to Marrero). Finally, on February 19, 2013, due to the Defendant's continued lack of responsiveness, Defendant's Senior Director of Labor Relations, Sandra Aung, Esq., emailed Marrero and Vidro to speak about Plaintiff's case and get "on the same page." Ex. Z at 96:5-21; Ex. EE (February 19, 2013 Aung email to Vidro and Marrero). Unfortunately, despite all the efforts by Plaintiff and on his behalf, Defendant never contacted him and he was never allowed to return to work.

Eventually, after a job search that dragged on for six months after he was terminated because of the black mark on his resume represented by his unexplained termination by the City of New York after 29 years of service, he finally obtained employment in western New York State – hours away from his family – at public dental clinic Oak Orchard Community Health. Ex. A at 229:16-230:6. Plaintiff's new boss was made aware that he had HCV upon Plaintiff's hire, and Plaintiff was authorized to perform and, in fact, did perform all of the dental procedures he had performed while employed by Defendant. *Id.*

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine material issue of fact requiring a trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1535 (2d Cir. 1997) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "When a motion for summary judgment is made and supported ..., an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita*, 475 U.S. at 586-87. In other words, the non-moving party must provide "affirmative evidence" from which a jury could return a verdict in its favor. *Anderson*, 477 U.S. at 257. "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Niagara Mohawk Power Corp. v. Jones Chemical, Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (*quoting Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998)). Moreover, "[t]he 'mere

existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat

summary judgment." *Id.* (*quoting Anderson*, 477 U.S. at 252).

## IV.   ARGUMENT

### A. Defendant Violated Plaintiff's Rights Under the ADA When It Suspended and Terminated Him from His Job Because It Wrongly Regarded Him as Disabled.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with

a disability because of the disability of such individual in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms,

conditions, and privileges of employment." 42 U.S.C. § 12112(a).[2]

#### a. Plaintiff Demonstrates Direct Evidence of Discrimination.

Where a plaintiff proffers direct evidence of discrimination that is undisputed in the record, he is

entitled to summary judgment on his disability discrimination claims. *Costello v. St. Francis Hosp.*, 258

F.Supp.2d 144, 151-52 (E.D.N.Y. 2003). Direct evidence is defined as "conduct or statements by persons

involved in the decisionmaking process that may be viewed as directly reflecting the alleged

discriminatory attitude." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997) (*quoting*

*Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir.1992)), *aff'd*, 175 F.3d 1008 (2d Cir.)

(unpublished table decision), *cert. denied*, 528 U.S. 817 (1999); *see also Randle v. LaSalle Telecomms.,*

*Inc.*, 876 F.2d 563, 569 (7th Cir.1989) ("by definition, direct evidence, if believed by the trier of fact, will

prove the particular fact in question without reliance upon inference or presumption").

Here, the record is replete with direct evidence that Defendant suspended and terminated Plaintiff

because of his HCV, and in fact, it contains no credible evidence whatsoever that he was suspended or

terminated for any other reason. Direct evidence of disability discrimination exists in the deposition

transcript of every single deposed employee of Defendant who contributed to the decisions in question, as

---

[2] *See, e.g., Warmsley v. New York City Transit Auth.*, 308 F.Supp.2d 114 (E.D.N.Y. 2004) (Plaintiff's motion for summary judgment on his ADA disability discrimination claim granted because regardless of actual disability, Defendant regarded Plaintiff as disabled within the meaning of the ADA); *Sobhi v. Sociedad Textil Lonia Corp.*, No. 13 CIV. 8073 AT MHD, 2014 WL 7474338, at *4 n.1 (S.D.N.Y. Dec. 30, 2014) (denying Defendant's motion to dismiss Plaintiff's "regarded as" disability discrimination claim).

well as in the documentary evidence in the record.

### i.   Eldon Redwood

Dr. Redwood, the Director of HHC OHS, testified that when he discussed Plaintiff's HCV and employment status with Dr. Siva Palan, the infectious disease consultant for OHS, during Plaintiff's suspension, they talked about viral loads and Dr. Palan noted that Plaintiff's viral load was "extremely high" and he "should be off duty or restricted." Ex. T at 49:13-17. He further testified that he "took Dr. Palan's counsel" regarding Plaintiff's proper duty status, and that in his opinion, Plaintiff's treatment of patients while his viral load was at the level noted in his July 2012 OHS blood test results represented a direct threat to the health of those patients.  *Id.* at 56:15-57:7. Dr. Redwood's uncontradicted testimony clearly shows not only that Plaintiff was suspended and ultimately terminated because of his HCV, but that Dr. Redwood regarded Plaintiff as a danger to patients because of it.

### ii.   Lawrence Bailey

Dr. Bailey, Plaintiff's direct supervisor and a fellow dentist for HHC, testified that after Plaintiff informed him that he had been suspended, Bailey conducted an investigation into why this had occurred, and based on what he was told by Dr. Reba Williams and Dr. Redwood, concluded that Plaintiff had been suspended pursuant to the SHEA Guideline because his viral load was not at an "acceptable level." Ex. D at 83:3-25.  He further testified that he was surprised that Plaintiff's HCV "was at a point where he had to be relieved of duty" because "H.R. knew about this for years." *Id.* at 85:22-25. Dr. Bailey's uncontradicted testimony clearly shows that Plaintiff was suspended and ultimately terminated because HHC didn't feel that his HCV viral load was "acceptable."

### iii.   Yvette Villanueva

Ms. Villanueva testified that what Plaintiff needed to do to return to work after he was suspended in July of 2012 was "to provide OHS whatever … clinical information they needed to clear him, relating to his existing condition." Ex. L at 20:10-18. She further testified that Plaintiff was "unfit for duty" as OHS defined it. *Id.* at 40:2-4. She further testified that Plaintiff's suspension represented "an opportunity

14

to get better" and therefore be cleared to return to work. *Id.* at 45:23-25. Finally, she testified that Plaintiff's medical condition was a factor in her decision to terminate his employment. *Id.* at 62:5-10. Ms. Villanueva's testimony unequivocally shows that Plaintiff was suspended pursuant to his blood test results and that as the final decisionmaker regarding Plaintiff's termination, she made that decision based on Plaintiff's medical condition, regarding him as disabled in violation of law.

### iv. Barbara Marrero

Ms. Marrero testified that Plaintiff was terminated because "he had hepatitis C and he failed to go to O.H.S. Therefore, it's a condition of employment which falls under my jurisdiction and he needed to be separated from employment." Ex. X at 25:2-13. She further testified that after she finally confirmed that Plaintiff had been suspended based on his HCV viral load and instructed Plaintiff to send her documentation that it was reduced, she then neglected to forward Dr. Lipsky's letter confirming Plaintiff's reduced viral load to OHS because Vidro "was the accommodations officer," not her, and she thus expected Vidro to pass it on to OHS. *Id.* at 35:4-24. Ms. Marrero's uncontradicted testimony clearly shows that Plaintiff was suspended, terminated, and not rehired because of his HCV viral load.

### v. Documents

Finally, a number of documents in the record represent direct evidence of disability discrimination. First, the NYS Workers' Compensation Board Notice of Decision demonstrates that in reality, it was HHC's position that Plaintiff's HCV represented no impediment to his practice of dentistry for HHC whatsoever. Ex. B. Secondly, both Plaintiff's suspension letter and his termination letter admit on their faces that Plaintiff was suspended and terminated for medical reasons. Ex. K; Ex. W. Finally, the Expert Report of Dr. Bernstein shows that despite a complete lack of evidence that there is any connection between viral load and the risk of transmission of HCV, Defendant regarded the details of Plaintiff's condition – his viral load – as an impediment to his continued work as a dentist at Grant. Ex. R.

### b. Plaintiff Can Also Demonstrate Discrimination Using the *McDonnell Douglas* Framework.

Absent direct evidence of discrimination, courts apply the burden-shifting analysis in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973), in evaluating disability discrimination claims under all three relevant laws. This analysis requires Plaintiff to first demonstrate a *prima facie* case of disability discrimination, showing, in relevant part, that (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the relevant job with or without a reasonable accommodation; and (3) he suffered an adverse employment action because of his disability. *Warmsley*, 308 F.Supp.2d at 119. (*citing Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001)).[3] "If Plaintiff meets this burden, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action. … Once the employer meets this burden, the inquiry becomes whether the Plaintiff can show that the proffered reason was not the true reason for the employment decision and that her disability was." *Costello*, 258 F.Supp.2d at 153 (internal quotations and citations omitted). Even if the copious direct evidence in the record did not exist, Plaintiff would still be entitled to summary judgment under the *McDonnell Douglas* analysis.

### i.   Plaintiff Has Made Out a *Prima Facie* Case of Disability Discrimination.

### 1.   Plaintiff was Disabled.

As used in the ADA, the term "disability" "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). "Disability" is defined as (a) a physical or mental impairment that substantially limits one or more major life activities; (b) a record of such an impairment; or (c) being regarded as having such an impairment. 42 U.S.C. §§ 12102(1)(A)-(C). An individual may establish his disability under any one – or more – of these prongs. 29 C.F.R. 1630.2(g)(2). Additionally, in amending the ADA, Congress stated: "If an individual establishes that he or she was subjected to an action prohibited by the ADA because of actual or perceived impairment – whether the person actually has the impairment or

---

[3] "The elements to find disability discrimination under the NYSHRL and NYCHRL generally track the ADA. … 'However, the NYSHRL provides broader protection than the ADA, and the NYCHRL is broader still.'" *Thomson v. Odyssey House*, No. 14-CV-3857 MKB, 2015 WL 5561209, at \*18 (E.D.N.Y. Sept. 21, 2015) (*citing Kinneary v. City of New York*, 601 F.3d 151, 158 (2d Cir. 2010). Accordingly, except as otherwise noted, Plaintiff is entitled to summary judgment on his state and city claims for the same reasons that justify summary judgment under the ADA.

whether the impairment constitutes a disability – then the individual will qualify for protection under the Act." 154 Cong. Rec. at S8842.[4] The term "'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

As Plaintiff had never experienced any professional limitations whatsoever due to his HCV prior to his suspension, he does not argue that his condition "substantially limits one or more major life activities" as required by the ADA. Ex. F at P 319; 42 U.S.C. §§ 12102(1)(A). Rather, Plaintiff is entitled to summary judgment on his ADA claim on the basis that Defendant regarded him as disabled. Under the ADA, "[b]eing regarded as having" a disability "means that the individual has been subjected to an action prohibited by the ADA as amended because of an actual or perceived impairment that is not both 'transitory and minor.'" 20 C.F.R. § 1630.2(g)(1). The ADAAA Judiciary Report provides examples of impairments that are "transitory and minor," including colds, flus, stomachaches, seasonal allergies, and hangnails. Here, it is completely indisputable that Plaintiff was suspended from his job because Defendant regarded his viral load as evidence that his HCV made him unfit for duty in any position requiring medical clearance for OHS, and that Plaintiff's suspension ultimately ended in his termination because OHS had refused to clear him for duty based on his HCV-related blood results.[5]

### 2. Plaintiff Was Qualified to Perform the Essential Functions of His Job.

Plaintiff's HCV was not an obstacle to any essential function of his work as a dentist for HHC, and he was fully qualified to perform those essential functions both at the time of his suspension in July of 2012 and at the time of his termination in December of 2012. In fact, Defendant is judicially estopped from arguing otherwise. "A party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding

---

[4] *See also* 29 C.F.R. § 1630.2(j)(1)(iii) ("The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis").
[5] *See, e.g.,* Ex. T at 49:13-17, 56:15-57:7; Ex L at 45:23-25, 62:5-10.

and (2) that position was adopted by the first tribunal in some manner, … such as by rendering a favorable judgment." *Mitchell v. Washingtonville Cent. School Dist.*, 190 F.3d 1, 6 (2d Cir. 1999) (internal citations omitted).  For purposes of judicial estoppel, statements made to the New York Workers' Compensation Board qualify as statements made "in a prior proceeding." *Id.* at 6-7.

When Plaintiff made a claim for workers' compensation benefits after he contracted HCV on the job in the 1990s, HHC successfully argued that Plaintiff's infection with HCV did not prevent him from performing the essential functions of his job, and thus that Plaintiff was not entitled to benefits. Ex. A at 138:17-25. The Workers Compensation Board issued a Notice of Decision on June 7, 2001, adopting HHC's position and finding that Plaintiff had "no compensable lost time." Ex. B. Accordingly, because Defendant successfully argued that Plaintiff's HCV did not impair him in adequately performing his job in order to secure a determination from the Workers' Compensation Board that Plaintiff was not entitled to benefits, it is now judicially estopped from taking a contradictory position. Even if Defendant were not estopped from making such an argument, however, it is eminently clear that Plaintiff's HCV, which he has been infected with for over two decades, has never impeded the successful performance of his duties as a dentist of any level for HHC or for his new employer. *See* Ex. A at 23:18-22, 55:19, 56:16-19, 74:1-5.

Defendant's only conceivable argument that Plaintiff's ability to perform his job was limited in *any* way by his HCV is based on the latest version of Defendant's Operating Procedure 20-19, which incorporates the SHEA Guideline and which came into effect six weeks *after* Plaintiff's suspension. In relevant part, it requires that any healthcare provider infected with HCV not perform "Category III" activities. Ex. J. There is no evidence that Plaintiff ever received a copy of this new version of 20-19, or that anyone ever even mentioned it to him, and in fact, Plaintiff testified that he had no knowledge of it at all.  Ex. A at 119:1-8. There is also absolutely no way to determine from the record whether Plaintiff's viral load has *ever* exceeded SHEA's barrier level, $10^4$ GE/mL, as Plaintiff's test results are reported in a completely different unit (IU/mL). *See* Ex. J; Ex. F at P 319. Even if Plaintiff's viral load *did* exceed the

18

relevant threshold, however, Operating Procedure 20-19 does the exact opposite of demonstrating that Plaintiff's HCV prevented him from performing the essential functions of his job. It specifically states – echoing SHEA – that "infected healthcare workers should **not** be totally prohibited from participating in patient care activities solely on the basis of a bloodborne pathogen infection." Ex. E.

### 3.  Plaintiff Suffered Multiple Adverse Employment Actions Due to His Disability.

There is no doubt that Plaintiff's suspension and termination were "adverse employment actions" as required by the *McDonnell Douglas* burden-shifting framework. "[A] suspension can comprise an adverse employment action where it negatively affects the terms and conditions of one's employment, or exceeds the employee's normal exposure to disciplinary policies by going beyond the employer's typical disciplinary procedures[.]" *Moran v. Wegmans Food Markets, Inc*., 65 F.Supp.3d 327, 331 (W.D.N.Y. 2014). Given that no explanation for Plaintiff's suspension can be found anywhere in Defendant's procedures, disciplinary or otherwise, that Plaintiff was first suspended without pay (*see, e.g.*, Ex. K), and that later, despite being told that he was "suspended with pay," Defendant depleted Plaintiff's sick leave before firing him (*see* Ex. A at 144:7-14), Plaintiff's suspension was just such a materially adverse suspension. Termination is always a materially adverse change in employment. *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003).

There is also no doubt that the relevant employment actions occurred because of Plaintiff's HCV. As noted above, Dr. Redwood, the director of HHC OHS, testified that Dr. Siva Palan told him that Plaintiff's viral load was "extremely high" and he "should be off duty or restricted," that Dr. Redwood "took Dr. Palan's counsel" regarding Plaintiff's proper duty status, and that in his opinion, Plaintiff's treatment of patients represented a direct threat to the health of those patients because of his HCV viral load.  Ex. T at 49:13-17, 56:15-57:7. Dr. Bailey, Plaintiff's direct supervisor, testified that Plaintiff had been suspended pursuant to the SHEA Guideline because his viral load was not at an "acceptable level," and that he was surprised that Plaintiff's HCV "was at a point where he had to be relieved of duty." Ex. D at 83:3-25, 85:22-25. Yvette Villanueva, the HR employee who made the ultimate decision to terminate

Plaintiff, testified that in order to return to work after his suspension, Plaintiff needed "to provide OHS whatever … clinical information they needed to clear him, relating to his existing condition," that Plaintiff's suspension represented "an opportunity to get better" and therefore be cleared to return to work, and that Plaintiff's medical condition was a factor in her decision to terminate his employment. Ex. L at 20:10-18, 45:23-25, 62:5-10. Ms. Villanueva's testimony unequivocally shows that Plaintiff was suspended pursuant to his blood test results and that as the final decisionmaker regarding Plaintiff's termination, she made that decision based on Plaintiff's medical condition. Finally, Barbara Marrero, the only HHC employee who ever provided any guidance to Plaintiff as to how he might return to work (which was provided *after* his termination), testified that Plaintiff had been suspended based on his HCV viral load and that she suggested to Plaintiff that he could return to work if he provided documentation that his HCV viral load was reduced. Ex. X at 35:4-24. All of this testimony is materially undisputed in the record, and all of it establishes unequivocally that Plaintiff's suspension and termination were motivated by his medical condition.

### ii. Any Purportedly Nondiscriminatory Reason for Plaintiff's Termination Advanced by Defendant is Pretextual.

Pretext may be demonstrated under the *McDonnell Douglas* analysis "either by the presentation of additional evidence showing that 'the employer's proffered explanation is unworthy of credence' … or by reliance on the evidence comprising the *prima facie* case, without more." *Chambers v. TRM Copy Centers Corp*., 43 F.3d 29, 38 (2d Cir. 1994) (*citing Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *St. Mary's Honor Center v. Hicks*, 113 S.Ct. 2742, 2749 (1993)). Where a defendant can provide no nondiscriminatory reason with any possibility of legitimacy, "[n]o additional proof of discrimination is required." *Id*.

In the case at hand, although Plaintiff has never been advised as to any legitimate, non-discriminatory justification that Defendant may purport to have for the adverse employment actions taken against him, Defendant's witnesses appear to suggest that at least with regard to the termination in December of 2012, HHC acted not because Plaintiff had HCV, but rather because after six months

of suspension, he had still failed to return to OHS for another medical clearance physical.[6] Such a "justification" is nowhere near sufficient to carry Defendant's burden at this step in the *McDonnell Douglas* analysis. The *undisputed* evidence in the record shows that Plaintiff had worked for Defendant for decades while infected with HCV with no issues, and nothing had changed at the time of his suspension or termination.

Defendant's only possible argument here – that what had changed was OHS's policy – is totally unavailing for more than one reason. First, the new HHC Operating Procedure 20-19 was not established until 40 days after Plaintiff's suspension. Ex. J. Second, and most importantly, even if it had been in effect, the new HHC Operating Procedure 20-19 *absolutely does not dictate that Plaintiff be suspended or terminated based on his HCV viral load*. *Id.* Even if the new 20-19 *did* dictate that Plaintiff be suspended from patient contact until he brought his viral load down – which it does not – he was *never* instructed to return to OHS for another physical or given any information whatsoever about how to return to work. Finally, when Plaintiff was able to glean the tiniest bit of information about what OHS believed he needed to do from Barbara Marrero, *after* his termination, Marrero told him that he needed to submit documentation from his physician of his reduced viral load. She said nothing whatsoever about Plaintiff returning to OHS. Ex. X at 35:4-24. Defendant's allusions to any purportedly nondiscriminatory basis for the actions taken against Plaintiff, as elicited during the depositions of its employees, are simply code or "double speak" for "HHC fired Plaintiff because we believed he was disabled."

The implication that after 29 years of dedicated service, Plaintiff either wanted to freeload or was simply too lazy to return to OHS to get his medical clearance is ludicrous, particularly in light of the copious evidence in the record of his months of attempts to extract any information at all from HHC regarding how to return to work. More importantly, even if HHC's true reason for firing Plaintiff was his failure to return to HHC for an additional physical, because HHC had no legitimate justification for

---

[6] *See, e.g.*, Ex. C at 23:18, 24:3, 32:7-33:6; Ex. X at 25:2-13, 35:4-24, 54:19-20.

suspending Plaintiff *or* for requiring him to submit to another OHS examination, this justification *itself* describes a termination based on Plaintiff's perceived disability, and therefore fails to represent a legitimate non-discriminatory reason for Plaintiff's termination in the first place. If, Defendant's actions were not based on Plaintiff's HCV, then why would he need to be cleared by OHS?

**B. Defendant Violated Plaintiff's Rights under the NYSHRL and NYCHRL When It Suspended and Terminated Him from His Job Because It Failed to Engage in the Interactive Process and Provide Him a Reasonable Accommodation.**

Under the broader standards of the NYSHRL and NYCHRL, Plaintiff does qualify as actually disabled, and he is entitled to summary judgment on this basis as well. The NYSHRL defines "disability" as "a physical mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques." NYSHRL § 292(21). Under the NYCHRL, the term "disability" means any "physical, medical, mental, or psychological impairment, or a history or record of such impairment." NYCHRL § 8–102(16). "These definitions are substantially broader than the definition of 'disability' under the ADA. *Hazeldine v. Beverage Media, Ltd*., 954 F.Supp.697, 706 (S.D.N.Y. 1997). Given the undisputed evidence in the record that HCV is both demonstrable by medically accepted techniques (*see, e.g.*, Ex. F, which presents lab results demonstrating that Plaintiff is infected with HCV) and impairing of Plaintiff's liver function (*see, e.g.*, Ex. A at 91-92, wherein Plaintiff discusses the expected abnormal results of his liver function tests and progressive deterioration of his liver), there is no credible argument that Plaintiff's HCV does not qualify as a disability for purposes of state or city law.

Where a plaintiff provides evidence of actual disability, he need only show that he could perform the essential functions of his job "with reasonable accommodation" for that disability. Under the NYSHRL and NYCHRL, "the first step in providing a reasonable accommodation is to engage in a good faith interactive process that assesses the needs of the disabled individual and the reasonableness of the accommodation requested and … failure to consider the accommodation ... is a violation of the

NYSHRL and the NYCHRL[.]" *Vangas v. Montefiore Med. Ctr.*, 6 F.Supp.3d 400, 420-21 (S.D.N.Y. 2014).[7] "The 'interactive process' requirement requires the employer to 'investigate an employee's request for accommodation and determine its feasibility.'" *Id.* at 420 (internal quotation omitted). An interactive process may involve a "meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the request is too burdensome." *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 218–19 (2d Cir. 2001) (internal quotations and citations omitted). Per this Court, without the interactive process, "many employees will be unable to identify effective reasonable accommodations. Without the possibility of liability for failure to engage in the interactive process, employers would have less incentive to engage in a cooperative dialogue and to explore fully the existence and feasibility of reasonable accommodations." *Vangas*, 6 F.Supp.3d at 420-21.

Between 2009 and his suspension, less than 10% of Plaintiff's work fell into "Category III" as defined in Operating Procedure 20-19. Ex. A at 101:1-6. Moreover, the fact that Plaintiff's supervisor Bailey and other HHC dentists were able to handle not just Plaintiff's Category III work, but *all* of Plaintiff's work during his suspension (not to mention the fact that Plaintiff was never replaced) demonstrates with clarity that no matter the circumstances, Plaintiff was at all times capable of the essential functions of his job with reasonable accommodation. Ex. D at 60:14-22, 61:20-62:6.

It is also self-evident that Defendant egregiously failed to engage in any interactive process with Plaintiff whatsoever, or even to interact with him after his suspension at all. First, after setting Plaintiff's

---

[7] *See also Martin v. United Parcel Serv. of Am., Inc.,* 104 A.D.3d 1173, 1174-75, 961 N.Y.S.2d 663 (4th Dep't 2013) (holding that the trial court "properly determined that defendant failed to eliminate all triable issues of fact," including "whether defendant engaged in an interactive process to ascertain plaintiff's needs and whether a reasonable accommodation was possible"); *Jochelman v. New York State Banking Dep't,* 83 A.D.3d 540, 920 N.Y.S.2d 661, 661-62 (1st Dep't 2011) (holding that issues of fact precluded summary judgment on plaintiff's claim that defendant failed to "engage[ ] in the good faith interactive process required by the [NYSHRL]"); *Morse v. JetBlue Airways Corp.,* 941 F.Supp.2d 274, 302 n.16 (E.D.N.Y. 2013) ("Unlike the ADA, under the NYSHRL and the NYCHRL, an employer's failure to engage in the interactive process is, by itself, a violation of the law") (internal citation omitted).

suspension in motion, Dr. Carey failed to provide him with a return to work form or any concrete information whatsoever as to how Plaintiff's suspension could be ended. Ex. A at 128:16-18. Instead, Carey confused the situation further by having Plaintiff sign a form indicated he would *not* be suspended from treating patients. Ex. H. Plaintiff's suspension letter also represents a failure to engage in the interactive process, as it provides no indication as to what Plaintiff needed to do to be cleared for duty. Ex. W. Vidro's indication to Plaintiff that Dwayne Davis would contact him and Davis's subsequent failure to ever reach out to Plaintiff at any point is self-evidently a failure to engage in the required interactive process, as is the fact that Plaintiff never heard from Vidro after July 23, 2012 despite multiple attempts at contact by or on behalf of Plaintiff. Ex. N; Ex. A at 145:17, 174:14-23, 183:3-12.

In fact, Defendant was so remiss in engaging in the required interactive process that it never even provided Plaintiff with a copy of the new HHC Operating Procedure 20-19, the only conceivable basis for failing to medically clear Plaintiff for duty in the first place. Ex. A at 119:1-8. Even at the last, when Defendant was preparing to terminate Plaintiff's employment, no HHC employee ever picked up the phone to find out what was going on with Plaintiff himself. In fact, Plaintiff's supervisor Bailey spoke to him on the phone about matters unrelated to Plaintiff's HHC employment status not long before Plaintiff was terminated, and Bailey said nothing about the situation to Plaintiff at all. Ex. D at 29:15. HHC's supervisory employees even failed to interact accurately with one another, and their communications both prior to and after Plaintiff's termination demonstrate miscommunication, factual inconsistencies, and resistance to reaching out to Plaintiff. *See, e.g.*, Ex. Q; Ex. Y.

Additionally, if Defendant had complied with the law and engaged in the required interactive process, there are multiple obvious reasonable accommodations that Plaintiff could have requested. When he was suspended, Plaintiff could have asked to be allowed to perform only Category I and Category II tasks until his viral load went down, which would have been a self-evidently reasonable accommodation given Bailey's testimony that there was no issue covering Plaintiff's patients during his suspension at all. Ex. D at 130:20-131:11. Moreover, when he was terminated, Plaintiff could have asked for an additional

4-5 weeks of leave in order to finish recovering from his grueling course of treatment. Because Defendant never reached out to Plaintiff at all – let alone engaged in the interactive process as contemplated by the NYSHRL and NYCHRL – Plaintiff never even had the chance to make these requests.

After Plaintiff's explicit protests to Bailey (*Id.* at 90:11-16) and McFarlane (Ex. M) that he was being illegally discriminated against based on his disability, Defendant's complete failure to explain to Plaintiff why he had been suspended or how he could return to work, and, despite Plaintiff's assurance by Vidro that he would be contacted by HHC Labor Relations regarding his employment status, the subsequent months of radio silence and refusal to substantively respond to inquiries made by or on behalf of Plaintiff – not to mention the decision to terminate Plaintiff without ever attempting to reach out to him at all – clearly represent an abject failure to engage in the interactive process as required by the NYSHRL and NYCHRL.[8] Defendant can point to no credible evidence to the contrary. Finally, Defendant's purportedly nondiscriminatory reasons for its actions are pretextual, per section III(A)(b)(ii), *infra*.

Consequently, based on the foregoing, Plaintiff is also further entitled to summary judgment based on his actual disability under the NYSHRL and NYCHRL.

## V.   CONCLUSION

For the reasons discussed above, Plaintiff respectfully requests that this Court grant his Motion for Partial Summary Judgment on Liability.

BERANBAUM MENKEN LLP

Dated:   New York, New York       By:
         December 9, 2015

_____
Grace Cretcher
Bruce E. Menken
Beranbaum Menken LLP
80 Pine Street, 33rd Floor
New York, New York 10005
Ph: (212) 509-1616
Fax: (212) 509-8088

---

[8] *See, e.g.*, Morse, 941 F.Supp.2d 274, 302 n.6.