UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

DOUGLAS M. STERNBERG,                    :          14 Civ. 1003 (PAC)
                                         :
                    *Plaintiff*,         :
                                         :          **<u>OPINION & ORDER</u>**
    - *against* -                        :
                                         :
NEW YORK CITY HEALTH AND                 :
HOSPITALS CORPORATION                    :
                                         :
                    *Defendant*.         :

---------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 7, 2016

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Dr. Douglas M. Sternberg worked as a dentist for the New York City Health and Hospitals Corporation (HHC) for over three decades. He was fired after he failed a medical clearance exam because of his hepatitis C infection. He now sues HHC, alleging that his termination amounts to employment discrimination under the Americans with Disabilities Act (ADA), the New York State Human Rights Law (NYSHRL), and the New York City Human Rights Law (NYCHRL). He moves for partial summary judgment on the issue of liability. The Court grants his motion in part.

## BACKGROUND

The parties do not dispute the following facts. Dr. Sternberg began working as a dentist for HHC in January 1985. Exh. A (Sternberg Dep.) at 29.[1] For 17 years he provided dental care to inmates at Riker's Island and the Queens House of Detention through Correctional Health Services. *Id.* at 42. In 1992, while treating a patient in custody at Riker's Island, Dr. Sternberg contracted hepatitis C from an inadvertent needle stick. *Id.* at 61. He did not learn he had contracted

---

[1] Citations to lettered exhibits refer to plaintiff's exhibits attached to the Declaration of Bruce E. Menken dated December 9, 2015 (Dkt. 41); citations to numbered exhibits refer to defendant's exhibits attached to the Declaration of Yuval Rubinstein dated December 31, 2015 (Dkt. 47).

the disease until four years later in 1996. *Id.* Dr. Sternberg notified Correctional Health Services when he learned of his infection, and he filed a workers' compensation claim. *Id.* at 55–56, 138. His claim was denied after a five-year investigation, and he continued to work as a dentist for HHC. *Id.* at 138; Exh. B.

Each year from 1994 to 2001, Dr. Sternberg was required to have an annual medical examination by HHC's Occupational Health Services (OHS), and each year he was cleared for duty. Sternberg Dep. at 46, 49. During this time, OHS knew that Dr. Sternberg suffered from hepatitis C and did not place any restrictions on his dental work or provide him any special instructions for how to treat patients. *Id.* at 56. In 2001, Dr. Sternberg was transferred within the HHC system from Correctional Health Services to Renaissance Health Care Network and employed as an Attending Dentist Level II at Sydenham Clinic. *Id.* at 43; Exh. D (Bailey Dep.) at 21. He was responsible for patient care and occasionally performed simple surgical tooth extractions, which constituted 5–10% of his practice. Sternberg Dep. at 43, 45, 47, 101; Exh. C. Upon beginning work at Renaissance, Dr. Sternberg was again medically cleared for duty by OHS, and there were no restrictions placed on his practice. Sternberg Dep. at 46, 56. In 2009, Dr. Sternberg was transferred within Renaissance Health Care Network from Sydenham Clinic to Grant Clinic. *Id.* at 74. As in previous years, he was annually examined by OHS and cleared to practice dentistry without any restrictions. *Id.* at 93–94; Exh. F.

Between 2001 and 2012, Dr. Sternberg's primary care physician was Dr. Monte Nussbaum. Sternberg Dep. at 57. Dr. Nussbaum performed annual physical examinations on Dr. Sternberg, including annual blood tests, and did not recommend any course of treatment for Dr. Sternberg's dormant hepatitis C. *Id.* at 59–60.

On July 9, 2012, Dr. Sternberg was examined by OHS physician Dr. Robert Carey for his annual OHS physical examination. *Id.* at 98. Dr. Sternberg again disclosed his hepatitis C. *Id.* In response, Dr. Carey showed Dr. Sternberg several pages of the Society for Healthcare Epidemiology of America Guideline for Management of Healthcare Workers Who Are Infected with Hepatitis B Virus, Hepatitis C Virus, and/or Human Immunodeficiency Virus. *Id.*; Exh. G (SHEA Guideline).[2] Dr. Sternberg signed a form-letter template that stated that under the SHEA Guideline, he was permitted to continue to work so long as he double-gloved, changed his gloves frequently, reported any injuries, and continued to see his physician. Exh. H. Dr. Carey signed a referral clearing Dr. Sternberg for duty and ordered bloodwork done. Sternberg Decl. at 99; Exh. I. Dr. Sternberg returned to Dr. Carey on July 13, 2012, for the results of his bloodwork. Sternberg Decl. at 107–08. Dr. Sternberg testified that Dr. Carey told him that his viral load was beyond the threshold level recommended by the SHEA Guideline and that he would be restricted from patient contact until the situation could be reviewed. *Id.* Dr. Sternberg further testified that Dr. Carey advised him to seek treatment from a specialist to lower his viral load. *Id.* at 108–09.[3]

Dr. Sternberg returned to work on administrative duty, and on July 18, 2012, his supervisor gave him a letter signed by HHC employee Henry McFarlane, which notified him that he was suspended without pay effective immediately because he failed to pass his annual physical exam-

---

[2]   The SHEA Guideline sets forth recommendations for healthcare providers who suffer from hepatitis B, hepatitis, C or HIV. In general, the SHEA Guideline states that healthcare providers should *not* be precluded from interacting with patients merely on the basis of their bloodborne infection. SHEA Guideline at 203. But it also recommends that healthcare providers who have a viral load above a certain threshold should be restricted from performing "Category III" procedures, which are procedures "for which there is definite risk for bloodborne virus transmission." *Id.* at 206 tbl.2. The only Category III procedures performed by Dr. Sternberg were surgical extractions, which constituted 5–10% of his practice. *Id.*; Sternberg Decl. at 101.

[3]   HHC disputes that Dr. Carey made these statements and objects to Dr. Sternberg's testimony as inadmissible hearsay. The Court's analysis does not rely on Dr. Carey's alleged statements; it is included only for context.

ination pursuant to HHC Operating Procedure 20-19 (OP 20-19). *Id.* at 11, 117; Exh. K. Dr. Stern-berg was not provided a copy of OP 20-19 at that time. Sternberg Decl. at 119. The then-current version of OP 20-19 did not refer to the SHEA Guideline (a revised version, adopted August 28, 2012, first incorporated the SHEA Guideline). Exh. 4; Exh. J. Nor did the suspension letter men-tion the SHEA Guideline. Exh. K.

Upon receiving the suspension letter, Dr. Sternberg left the clinic and called McFarlane. Sternberg Decl. at 120. That call was memorialized the following day in an e-mail from Dr. Stern-berg to McFarlane. Exh. M. In the e-mail, Dr. Sternberg objected to McFarlane's decision not to permit him to take sick leave, informed McFarlane that HHC had known about Dr. Sternberg's hepatitis C and had allowed him to treat patients for years, advised McFarlane that the Center for Disease Control does not recommend restricting the duties of healthcare workers with hepatitis C, and noted that he may be legally protected under the ADA. *Id.* McFarlane responded that he had forwarded Dr. Sternberg's e-mail to Jorge Vidro, an HHC Network Human Resources EEO Of-ficer, for "follow-up and resolution." Exh. N. Dr. Sternberg e-mailed Vidro to reiterate his request for sick leave, and Vidro responded that Dwayne Davis of HHC's Network Labor Relations group, who was copied on Vidro's e-mail, would look into "the details of [Dr. Sternberg's] suspension and get back to [him] soon regarding [his] duty status. *Id.* Dr. Sternberg responded that he wanted to return to work as soon as possible and that he looked forward to "continued communication and cooperation" with Vidro and HHC. *Id.* Dr. Sternberg understood Vidro's e-mail correspondence to mean that there was going to be an investigation, that he would be contacted by HHC Labor Relations regarding next steps, and that there would be a dialogue amongst the parties so that a

resolution could be reached. Sternberg Dep. at 145. In the meantime, Dr. Sternberg sought treatment from gastroenterologist Dr. Harold Lipksy, consistent with Dr. Carey's advice of July 13, 2012, to lower his viral load. *Id.* at 127, 130–31.

On September 3, 2012, six weeks after his last correspondence with Vidro, Dr. Sternberg again e-mailed him to let him know that he had not been contacted by Labor Relations or Human Resources. Exh. N. He received no response. Sternberg Decl. at 49. Dr. Sternberg then contacted his union representative Laurie Davidson, who made multiple attempts to contact Vidro by e-mail and telephone. *Id.*; Exh. O; Exh. P; Exh. Z (Davidson Dep.) at 81. But no one from HHC Human Resources, Labor Relations, or OHS ever contacted Dr. Sternberg or Davidson. Sternberg Decl. at 145, 174, 183.[4]

On December 15, 2012, Dr. Sternberg received a letter summarily terminating his employment with HHC. Exh. W. The letter, which was signed by Barbara Marrero and dated December 6, 2012, terminated Dr. Sternberg because he had failed to maintain his annual medical clearance as required by OP 20-19. *Id.* The letter stated that "[a]ll attempts to contact [Dr. Sternberg] regarding confirmation of a renewal and current medical clearance ha[d] been unsuccessful," and that Dr. Sternberg "[had] not presented [his] department and Human Resources with any documentation evidencing [his] annual medical clearance." *Id.* But the record contains no evidence whatsoever of any attempt to contact Dr. Sternberg "regarding confirmation of a renewal and current medical clearance." *Id.* And Dr. Sternberg's multiple attempts to contact HHC before he was terminated went unanswered. Sternberg Decl. at 49; Exh. O; Exh. P.

---

[4]  The record does not explain why no one from HHC attempted to contact Dr. Sternberg or return Dr. Sternberg's or Davidson's attempts to contact HHC, but on December 6, 2012, James Brady, Associate Director of Finance, sent an e-mail to Vidro and Vidro's supervisor, Yvette Villanueva, expressing surprise and concern that Dr. Sternberg's case had not yet been resolved. Exh. Q ("This has been hanging out unresolved for 4 months with no communication until I ask? This is ludicrous[.]"). Villanueva responded: "We are addressing it. Stop his paycheck." *Id.*

Marrero testified that the decision to fire Sternberg was "made through Mr. Vidro." Exh. X (Marrero Dep.) at 25. She explained that Vidro, who has since died, told her that "there was a particular employee who failed to go to OHS, that he had hepatitis C and he failed to go to OHS. Therefore, it's a condition of employment which falls under my jurisdiction and he needs to be separated from employment." *Id.* Yvette Villanueva, Vidro's supervisor, testified that Dr. Sternberg had failed his annual medical clearance. Exh. L (Villaneuva Dep.) at 18. When asked how he failed, she explained that OHS gave Dr. Sternberg "some sort of test" and that he was "unfit for duty" because his test results did not meet HHC's standards. *Id.* She also testified that Dr. Sternberg was fired because Grant Clinic needed someone to replace Dr. Sternberg because patient care was suffering. *Id.* at 61.

After he was terminated, Dr. Sternberg contacted Davidson. Davidson Dep. at 81. When Davidson finally spoke with Marrero on January 3, 2013, Marrero told her that she would discuss Dr. Sternberg's employment with her once his viral load was reduced and he had clearance from his doctor. *Id.* at 90; Exh. P. On January 17, 2013, Dr. Sternberg faxed Marrero a release authorizing Marrero to speak to his wife and a letter from Dr. Lipsky confirming his reduced viral load. Sternberg Dep. at 177; Exh. AA.[5] Since she was again unable to contact Marrero by telephone, Davidson also e-mailed the letter the following day. Exh. BB. The fax, telephone messages, and e-mail all went unanswered, as were calls made by Dr. Sternberg's wife.[6]

---

[5]   Throughout his suspension, Dr. Sternberg was treated by Dr. Lipsky to lower his viral load. Sternberg Dep. at 130. Dr. Lipsky prescribed a new treatment of three medications that successfully reduced Dr. Sternberg's viral load to undetectable levels by October 23, 2012. *Id.* at 132; Exh. V. But the treatment had debilitating side effects requiring significant post-treatment recovery time. *Id.* at 152–52, 189. Dr. Sternberg relapsed within three months after he completed treatment in January 2013. Sternberg Dep. at 189–90.

[6]   There is no explanation for Marrero's failure to return any of Dr. Sternberg's or Davidson's messages; but she stated in an e-mail to Vidro that she refused to return Dr. Sternberg's wife's calls because "[s]he was nasty to the staff." Exh. CC.

After a six-month job search, Dr. Sternberg was hired by Oak Orchard Community Health, a public dental clinic in western New York. Sternberg Dep. at 229–30. On February 18, 2014, Dr. Sternberg filed this case against HHC alleging employment discrimination in violation of the ADA, the NYSHRL, and the NYCHRL. Dr. Sternberg now moves for partial summary judgment on the issue of liability.

## LEGAL STANDARDS

### I.   Summary Judgment

The Court may grant summary judgment only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment lies where a non-moving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### II.   ADA Claims

In evaluating a claim brought under the ADA, the Court applies the familiar burden-shifting framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). To state a *prima facie* case, a plaintiff "must prove that: (1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action [on the basis] of his disability or perceived disability." *Kinneary v. City of New York*, 601 F.3d 151, 155–56 (2d Cir. 2010) (citation and international quotation marks omitted); 42 U.S.C. § 12112(a). If the plaintiff satisfies these elements, "the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence

and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am.,*
*Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

### III.   NYSHRL and NYCHRL Claims

Claims of intentional discrimination on the basis of disability under NYSHRL are identical
to such claims under the ADA. *See Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 n.3 (2d Cir.
2006). Although claims under NYCHRL are ordinarily subject to an "independent analysis,"
*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013), Dr. Stern-
berg's motion does not independently analyze his NYCHRL claim. The Court will not provide
such analysis sua sponte. Instead, the Court assumes that Dr. Sternberg's NYCHRL claim rises or
falls with his ADA claim. *Cf. McDonnell v. Schindler Elevator Corp.*, 618 Fed. App'x 697, at *7
(2d Cir. 2015).

### DISCUSSION

Dr. Sternberg moves for partial summary judgment on the issue of liability, claiming that
(1) HHC is covered by the ADA; (2) he was regarded as disabled; (3) he was qualified to do his
job; and (4) HHC fired him on the basis of his hepatitis C infection. HHC does not dispute that it
is covered by the ADA and assumes, without admitting, that plaintiff was regarded as disabled. It
argues that plaintiff's high viral load rendered him unable to perform the essential functions of his
job and that he was fired on that basis, not because he was regarded as disabled. The Court holds
that Dr. Sternberg's high viral load did not render him unqualified to perform his job. Nonetheless,
a genuine factual dispute remains regarding whether HHC had a non-discriminatory basis for ter-
minating Dr. Sternberg.[7]

---

[7] Where a plaintiff claims that he was wrongly "regarded as" disabled, the defendant need not provide a reasonable
accommodation for the plaintiff's disability. *See* 29 C.F.R. § 1630.9(e). Dr. Sternberg also claims that HHC vio-
lated the NYSHRL and NYCHRL by failing to reasonably accommodate his hepatitis C infection. But the Court

I.  **Dr. Sternberg was qualified to practice as a dentist when HHC suspended and then terminated him.**

It is undisputed that Dr. Sternberg attended annual physicals with both his personal physician and OHS physicians; that he had annual blood screenings and discussed the results of those screenings with his physicians; that he followed the recommendations of his physicians regarding his hepatitis C infection; and that each year from 1994 until 2012 he was cleared for duty with no restrictions. On that basis, Dr. Sternberg argues that his hepatitis C infection was not an obstacle to any essential function of his work as a dentist and that he was fully qualified to perform those essential functions both when he was suspended beginning July 18, 2012, and when he was terminated on December 15, 2012.

In response, HHC asserts that Dr. Sternberg's high viral load posed a "direct threat to the health and safety of his patients," which rendered him unqualified to practice dentistry. Response Br. at 8. HHC further suggests that Dr. Sternberg's own conduct created that risk:

> Prior to 2012, defendant cleared plaintiff to work with the understanding that plaintiff's [hepatitis C] was treated and under control. But in 2012, defendant learned that was not the case, as plaintiff's viral load had exploded due to plaintiff's prolonged failure to treat his [hepatitis C]. It was at *that* point when plaintiff was deemed no longer qualified to perform the essential functions of the job.

*Id.* at 6. But this portion of HHC's brief—which includes not one citation—does not accurately reflect the record and appears to be creative rather than factual. There is no evidence that HHC presumed Dr. Sternberg was treating his hepatitis C before 2012. There is no evidence that Dr. Sternberg neglected his illness or that he should have undergone treatment before 2012. There is no evidence that Dr. Sternberg's viral load increased (let alone "exploded") in 2012.

---

need not decide that question because the Court finds that Dr. Sternberg was qualified to perform the essential functions of his job even without any accommodation.

The only thing that *did* change in 2012 was HHC's adoption—over a month after Dr. Stern-berg's suspension—of revised OP 20-19. Assuming that revised OP 20-19 could be applied *before* its adoption, neither it nor the SHEA Guideline provides any justification for Dr. Sternberg's sus-pension or termination. Indeed, both OP 20-19 and the SHEA Guideline state that "infected healthcare providers should *not* be totally prohibited from participating in patient-care activities solely on the basis of a bloodborne pathogen infection." SHEA Guideline at 203; OP 20-19 at 16. Instead, OP 20-19 mandates that healthcare providers who suffer from hepatitis C and have viral loads above the SHEA Guideline's threshold level should not perform certain "Category III" pro-cedures "associated with a risk for provider-to-patient [hepatitis C] transmission despite the use of appropriate infection control procedures." OP 20-19 at 17–18. The only Category III procedures Dr. Sternberg performed for HHC were surgical extractions, which constituted only 5–10% of his practice. SHEA Guideline at 206 tbl.2; Sternberg Dep. at 101.[8] The only other requirements im-posed by OP 20-19 are that healthcare providers with above-threshold viral loads "routinely use double-gloving for all invasive procedures, for all contact with mucous membranes or non-intact skin, and for all instances in patient care for which gloving is routinely required." OP 20-19 at 17–18; *see also* SHEA Guideline at 204. Thus, by outlining the circumstances under which an infected healthcare provider *can* safely practice, OP 20-19 refutes HHC's argument that Dr. Sternberg's hepatitis C posed a direct threat to the health and safety of his patients.

HHC asserts that Dr. Sternberg was "provided several months to lower his viral load in accordance with the Guidelines [sic], but failed to provide defendant *any* documentation of his

---

[8] Although HHC asserts that oral surgery was "an essential function of plaintiff's job," Response Br. at 9, it is uncontested that surgical extractions constituted only 5–10% of Dr. Sternberg's practice, Sternberg Decl. at 101. And surgical extractions are only one task of 14 listed in the job description for Attending Dentist Level II. Exh. C. HHC presents no evidence or argument why one task constituting only 5–10% of Dr. Sternberg's work should be considered "an essential function" of his job. *Cf. Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997).

treatment through December 2012." Response Br. at 8. This argument is rejected for two reasons. First, the SHEA Guideline does not mandate that infected healthcare providers to keep their viral load below the threshold level; instead it limits their practice to Category I and II procedures and requires double gloving. Notwithstanding Dr. Sternberg's above-threshold viral load, he was able to perform the essential functions of his practice "in accordance with" the SHEA Guideline. Second, it is both inappropriate and unfair for HHC to assert that Dr. Sternberg failed to provide it with documentation when HHC consistently—and apparently *intentionally*—ignored his repeated attempts to contact HHC.

There is no genuine question of material fact whether Dr. Sternberg was qualified to perform his job. The Court GRANTS Dr. Sternberg summary judgment on this issue.

## II. Questions of fact remain regarding whether HHC intentionally discriminated against Dr. Sternberg on the basis of his disability.

OP 20-19 and the SHEA Guideline do not support HHC's position that Dr. Sternberg was a threat to patients' health or safety or otherwise unqualified to practice. While incorrect, taking that position does not in itself amount to intentional discrimination. *See Nurse v. Lutheran Med. Ctr.*, 854 F. Supp. 2d 300, 319 (E.D.N.Y. 2012) (holding that to survive defendant's motion for summary judgment "plaintiff must come forward with some evidence that [defendant's] purported failure to follow its Policies was due to unlawful discrimination, not merely that [defendant's] decision was unfair or unjustified"); *cf.* 42 U.S.C. § 12113(b) (permitting "a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace"). To prevail on summary judgment, Dr. Sternberg must show there is no genuine question of fact whether HHC intentionally discriminated against him "on the basis of" his hepatitis C infection. 42 U.S.C. § 12112(a); *see Sista*, 445 F.3d at 169.

Dr. Sternberg cites, as "direct evidence" of discrimination, statements from HHC employees that reference his hepatitis C infection as a ground for his termination. HHC responds that those statements in fact show that its employees believed, in good faith, that Dr. Sternberg was unqualified to practice as a dentist, either because he had failed to maintain his medical clearance or because his disease posed a threat to his patients. For example, Marrero testified that Dr. Sternberg was fired because "he had hepatitis C and he failed to go to OHS." Marrero Dep. at 25. And Villanueva testified that he was "unfit for duty" because he had "failed . . . his annual medical clearance." Villanueva Dep. at 18. Even Dr. Sternberg's moving papers describe Director of OHS Dr. Eldon Redwood's testimony as showing "not only that [Dr. Sternberg] was suspended and ultimately terminated because of his [hepatitis C], but that Dr. Redwood regarded [him] as a danger to patients because of it." Opening Br. at 14.

Dr. Sternberg argues that these so-called non-discriminatory reasons for firing him are pretextual. In particular, he points to the fact that OP 20-19 does not mandate that he be suspended or terminated on the basis of his elevated viral load. Further, HHC's conduct in "going silent" and failing to respond to Dr. Sternberg's numerous attempts to contact HHC supports an inference that HHC's proffered non-discriminatory reasons are pretextual. But that inference is met by a counter-inference based on Dr. Sternberg's testimony that Dr. Carey told him his viral load was too high for him to be medically cleared, showed him the SHEA Guideline, and advised him to seek treatment from a specialist to lower his viral load. Sternberg Dep. at 97, 107–09. His suspension letter stated that he was being suspended because he had "failed to maintain [his] annual medical clearance as required." Exh. K. And it is clear that Dr. Sternberg thought that he had to lower his viral load to return to work because he sought treatment and successfully lowered it. So even if OP 20-

19 did not require him to lower his viral load, clearly certain HHC employees thought that it did, and Dr. Sternberg thought so too.

As for HHC's failure to respond to Dr. Sternberg's and his representatives' repeated attempts to contact HHC, this breakdown in communication may be explained by bureaucratic fumbling. Indeed, Dr. Sternberg remained on paid leave until an administrator noticed that his case had not been resolved for four months and sent an angry e-mail to Vidro and Villanueva. Exh. Q. In response, Vidro and Villanueva terminated Dr. Sternberg, noting that he had failed to maintain his medical clearance for six months. Villanueva Dep. at 18 ("According to OHS, he failed his medical clearance, his annual medical clearance. . . . They gave him some sort of test. The result of those tests did not meet the requirement that HHC follows, so he was unfit for duty at that time."); *id.* at 57 ("I made the decision that it was time to terminate his services because he was still unfit for duty."). From that evidence, a jury could reasonably determine that HHC unprofessionally and incompetently handled Dr. Sternberg's case—but fired him based on a good-faith (though incorrect) determination that he was unqualified. It thus remains a question of fact for the jury whether HHC intentionally discriminated against Dr. Sternberg on the basis of his hepatitis C. The Court DENIES summary judgment on this issue.

## CONCLUSION

Dr. Sternberg's motion for partial summary judgment is GRANTED IN PART and DENIED IN PART. The Clerk of Court is directed to terminate the motion at Docket No. 38.

Dated:   New York, New York                           SO ORDERED
         June 7, 2016

                                         PAUL A. CROTTY
                                         United States District Judge